UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| O. Z. MARTIN,<br>        Petitioner,<br>    v.<br>TIM VIRGA, Warden,<br>        Respondent.<br>_____/ | No. C-12-1351 EMC (pr)<br><br>**ORDER OF DISMISSAL** |

## I. INTRODUCTION

O. Z. Martin filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent has moved to dismiss the habeas petition as successive, untimely and procedurally barred. Martin has opposed the motion. For the reasons discussed below, the petition will be dismissed as an impermissible successive petition and, alternatively, as an impermissible second petition. In light of these determinations, the court need not also decide whether it is untimely and procedurally barred.

## II. BACKGROUND

A. State Court Proceedings

This action concerns a conviction resulting from Martin's 1998 attack on his 73-year old landlord with a machete. The evidence at the 2000 jury trial in Alameda County Superior Court was described in Martin's earlier federal habeas action:

> On August 9, 1998, petitioner attacked his landlord, 73-year old Arba Fields, with a machete, inflicting serious wounds that required stitches and surgery, and resulted in permanent injuries. Petitioner struck

1    Fields with the machete eight or nine times on his head, hands, arms, back, and leg. RT 452, 457.

2    Two weeks prior to the attack, Fields had initiated eviction proceedings against petitioner due to petitioner's marijuana use and problems with other tenants. RT 434. After learning he was being evicted, petitioner told the apartment manager, Willie Jones, that he was going to "take care" of Fields. RT 34.

On the day of the attack, Fields and Jones were putting security bars on one of the windows in the apartment building. RT 39. When Fields walked to his van to get a tool, petitioner came up behind him. RT 448-449. Holding a machete, petitioner walked towards Fields saying, "I'm going to keep you from messing up my life." RT 449. Petitioner swung the machete and hit Fields like he was "whuppin' a dog." RT 451-454. Jones heard someone "hollering" and went to see what was going on. Jones saw Fields on the ground bleeding with petitioner standing over him. Jones told petitioner, "please, man, don't kill that man." Petitioner responded, "I'm going to kill that black m-f." RT 43. When Jones again told petitioner to stop, petitioner turned on Jones and stated, "I'm going to kill you too, you black m-f," and started chasing Jones with the machete. RT at 43. While Jones ran away, Fields went into a nearby market. RT 455. Petitioner returned to his apartment, where he was soon arrested. RT 99-100, 265.

Multiple witnesses observed the attack and corroborated the foregoing account by Fields and Jones. The police recovered the machete. RT 373, 375, 403. The police did not find any guns or any weapons other than the machete. RT 376, 391.

**B.    Defense Case**

Petitioner testified on his own behalf that on the day of the attack, he ran into Fields as he was on his way out to look for a new apartment. RT 579. He approached Fields to hand him a restraining order against his ex-girlfriend, Bernetta Lloyd, whom he believed was then in a relationship with Fields. RT 584. Fields said, "mother fucker, I'm tired of you causing me all these problems." Unexpectedly, Fields hit petitioner in the head with a small black object. The blow knocked petitioner's glasses off and petitioner was cut on the bridge of his nose and his eye. RT 584-86. Petitioner said Fields had hit him with a gun and that he recognized the gun because he'd seen it before. RT 585-86. While petitioner retrieved his glasses, Fields pulled out the machete. RT 587. The two men struggled over the weapon and petitioner gained control of it. When Fields tried to run, petitioner struck him once on the leg and Fields fell. Petitioner then struck him three or four more times. RT 586. Petitioner struck Fields with the machete because he thought Fields had a gun and he felt threatened for his life. RT 591. Petitioner said Fields had pulled a gun on petitioner before and threatened his life. RT 559, 591, 608.

Docket # 24, pp. 1-3, in *Martin v. Carey*, No. C 03-4659 MJJ.

2

The jury found Martin guilty of attempted murder. *See* Cal. Pen. Code §§ 187, 667. The jury further found that the attempted murder was not willful or premeditated, but found that Martin personally used a deadly and dangerous weapon and inflicted great bodily injury. *See* Cal. Pen. Code § 12022(b). Martin was sentenced to 43 years to life in prison. His conviction was affirmed on appeal and his several state habeas petitions were denied.

B.  2003 Habeas Action

In 2003, Martin filed a federal habeas petition challenging the conviction. *See Martin v. Carey*, No. C 03-4659 MJJ (the "2003 habeas action"). In the 2003 habeas action, Martin asserted fourteen claims for federal habeas relief. One of his several claims for ineffective assistance of counsel ("IAC") was that trial counsel failed to investigate and pursue a diminished capacity or other mental defense. That claim was rejected on the merits:

> Petitioner contends that his trial counsel was ineffective because he did not thoroughly investigate petitioner's history of mental illness and present a diminished capacity or other impairment.
>
> A defendant is not prejudiced by his attorney's failure to investigate and present a mental health defense if the defense is not recognized under state law. *Sandgathe v. Maass*, 314 F.3d 371, 382 (9th Cir. 2002). California has abolished the use of a diminished capacity defense. Cal. Pen. Code, §§ 25, 28. Therefore, petitioner's attorney was not deficient in not pursuing this defense, nor was petitioner prejudiced thereby. Petitioner also fails to show how his two prior suicide attempts, history of depression, and the fact that he was subject to psychiatric care and medicine in prison would support any other mental defense. California law recognizes the mental defense of not guilty by reason of insanity. The defendant must prove by a "preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense." Cal. Pen. Code, § 28. Petitioner would therefore have to show that he was afflicted with something more than depression that rendered him incapable of understanding the nature of his act and distinguishing right from wrong. Even if, as petitioner asserts, a thorough investigation "would have revealed that petitioner was released from prison with a supply of psychiatric medication that petitioner was taking for his mental illness outside of prison" and that his parole officer was aware of his mental illness, there is nothing to support the assertion that petitioner's mental state at the time of his attack on Fields met California's standard for not guilty by reason of insanity.
>
> It was also well within trial counsel's discretion to proceed with the theory that petitioner acted in self-defense rather than that he was insane at the time of the attack. Once counsel reasonably elects to

3

> pursue one defense theory, "the need for further investigation [of the other theory] may be considerably diminished or eliminated altogether," *Strickland*, 466 U.S. at 694, especially if the two defenses are incompatible. *Turk v. White*, 116 F.3d 1264, 1267 (9th Cir. 1997). *Turk*, 116 F.3d 1264 at 1266. Presentation of both defenses would have been unsound because the two are incompatible: the self-defense theory required petitioner to prove he was acting reasonably under the circumstances to protect himself, whereas the insanity defense would have required petitioner to prove he did not know what he was doing. *Id.* "Pursuit of these conflicting theories would have confused the jury and undermined whatever chance [petitioner] had of an acquittal." *Id.* Counsel was not unreasonable and "it was within the broad range of professionally competent assistance for [petitioner's] attorney to choose not to present psychiatric evidence which would have contradicted the primary defense theory." *Correll v. Stewart*, 137 F.3d 1404, 1411 (9th Cir. 1998). [¶] Accordingly, petitioner is not entitled to habeas relief on this claim.

2003 habeas action, Docket # 24, pp. 17-19.

The district court and appellate court denied Martin's request for a certificate of appealability in the 2003 habeas action. As a result of those rulings, the 2003 habeas action came to a close in 2007.

C.    2012 Habeas Action

Martin applied to the U.S. Court of Appeal for the Ninth Circuit for authorization to file a second or successive habeas petition with regard to the 2000 conviction. The Ninth Circuit granted authorization on February 14, 2012. *See Martin v. Virga*, Ninth Cir. No. 11-72405 (Feb. 14, 2012 order).

Martin then filed a new habeas petition to commence this action, Case No. C 12-1351 EMC (the "2012 habeas action"). In his 2012 petition, Martin asserts two claims: (1) he is actually innocent of the attempted murder, so his sentence for the crime violates his rights under the Fourteenth Amendment's Due Process and Equal Protection Clauses and under the Eighth Amendment; and (2) trial counsel provided ineffective assistance of counsel in that he neglected to obtain Martin's medical/mental health records from the Social Security Administration that would have enabled him to show Martin was insane at the time of the offense.

Respondent now moves to dismiss the petition, urging that the 2012 habeas petition must be dismissed as successive, untimely, and procedurally barred. Martin contends that any procedural

problems with his 2012 petition should be excused because there otherwise would be a fundamental miscarriage of justice in that he is actually innocent by reason of his insanity at the time of the crime. *See* Docket # 1, p. 11.[1]

D. <u>The 2003 and 2012 Evidence Regarding Martin's Mental Illness</u>

Martin obtained permission from the Ninth Circuit to file his 2012 habeas petition by arguing that new evidence, combined with the evidence from the 2003 habeas action, would have been sufficient to prove insanity. This court also must look at the evidence first presented in 2012 to see if it can enable Martin to avoid the considerable procedural hurdles that face him. Martin's suggestion that the Ninth Circuit's authorization requires this court to allow his petition to proceed fails to persuade. The statute clearly contemplates a more searching review of the potentially successive/second petition by the district court after the appellate court has granted permission: only a prima facie showing is needed to obtain permission from the appellate court to have the petition filed, *see* 28 U.S.C. § 2244(b)(3)(C), while the district court must dismiss any claim that fails to actually satisfy the requirements of § 2244(b)(1) or (2). *See* 28 U.S.C. § 2244(b)(4).

    1. <u>Evidence in 2003 Habeas Action Regarding Martin's Mental Health</u>

The evidence in the 2003 habeas action included the following:

(1) There was a medical evaluation form dated March 17, 1994 from the Criminal Justice Mental Health Program in Alameda County while Martin was in custody on another criminal charge. Resp. Ex. B at 434 (Docket # 10-9, p. 59). The notes on the form stated that Martin had made his second suicide attempt within a week when a "wave" of depression hit him, had chronic lower back pain, was "experiencing delayed onset sleep and fitful sleep," felt depressed, appeared "sad," had a "blunted affect," and had reported "hearing voices 'talking dirty.'" *Id.* The doctor's impressions were "depression" and rule out "underlying psychosis." *Id.* The doctor's plan was to

---

[1] The court does its analysis mindful of the fact that it has less than a full record from the 2003 habeas action because the exhibits to respondent's answer in the 2003 habeas action are not available to the court. Nonetheless, the parties have submitted sufficient argument and evidence from the 2003 habeas action for this court to adequately evaluate the procedural issues here. For example, respondent in his motion to dismiss identified the particular pages in the 400+ pages of argument presented by Martin in the 2003 habeas action that address the ineffective assistance of counsel claim with regard to the insanity issue, and Martin identified the evidence of his mental state that was presented in the 2003 habeas action.

1  return the patient to custody, start him on elavil, and set a follow-up appointment with a doctor in 1-
2  2 weeks.

3    (2) There was the discharge summary dated August 7, 1998 from the San Leandro
4  Hospital, two days before the commission of the crime. Resp. Ex. B at 435-439 (Docket # 10-9, pp.
5  60-64). In that report, the doctor did not list a mental illness, although he did note acute alcohol
6  intoxication as well as several physical ailments. In the review of the patient's systems, the doctor
7  wrote this neurologic evaluation: "The patient is in considerable distress and depression related to
8  chronic lower back pain and alcoholism, but denies any disturbance of vision, gait, speech,
9  equilibrium, cognition." *Id.* at 436. The doctor wrote this of the neurologic part of the physical
10 examination: "Grossly normal for speech, gait, attention, cognition. Affect is depressed, anxious,
11 rather angry and impatient." *Id.* Martin was treated for gastro-intestinal distress and "improved
12 considerably" during the hospitalization. *Id.* at 437. "[T]he patient . . . complained that he had to be
13 discharged on Friday afternoon, the 7th, due to problems with an eviction. However, he was not
14 completely medically stable, as he was having some nausea. Apparently, that afternoon the patient
15 departed. . . . Discharge plans were not able to be discussed with the patient since he departed
16 against medical advice." *Id.* at 437. The notes show that on August 5, 1998, he was given Zantac
17 (an antacid), Librium (an anti-anxiety medicine), Zetril (a high blood pressure medicine), and
18 Ultram (a pain reliever). *Id.* at 439. There is no indication he was given any anti-psychotic
19 medication.

20   (3) An excerpt from a legal brief that apparently was submitted in connection
21 with sentencing recounted Martin's mental health history. Resp. Ex. B at 440 (Docket # 10-9, p.
22 65). According to that brief, after Martin's arrest in August 1998, a doubt was declared as to his
23 competency and criminal proceedings were suspended pursuant to California Penal Code § 1368.[2]
24 Three alienists were appointed to examine him, and two of them found him incompetent to stand
25 trial. One of the psychologists "concluded that Mr. Martin has psychosis or paranoid-type,
26 schizophrenia, if not due to organic factors." Resp. Ex. B at 440 (Docket # 10-9, p. 65). Another

---

[2] According to a letter written by his attorney, criminal proceedings were not suspended immediately upon his arrest but instead on September 30, 1998. *See* Docket # 1, p. 75.

1  psychologist concluded that Martin "was suffering from a psychotic disorder, alcohol abuse and a
2  paranoid personality disorder." *Id.* Martin was sent to Atascadero State Hospital for treatment on
3  February 18, 1999 and, after a month of treatment, was certified as mentally competent a month later
4  so criminal proceedings were reinstated on April 5, 1999. "Martin has remained on psychotropic
5  medication, namely thorazine and cenaquan, since his return." *Id.* He was under the care of the
6  mental health staff while being housed in general population.

(4)  An excerpt of a transcript of a pretrial hearing shows that his attorney stated he had no intention of presenting evidence of a psychiatric condition. Resp. Ex. B at 441 (Docket # 10-9, p. 66). Defense counsel made a conscious choice, and asked the court for an *in limine* order directing the prosecutor not to cross examine Martin "if Mr. Martin does testify as to his psychiatric hospitalization after criminal proceedings were initiated in this case." *Id.*

2.  Evidence First Presented in 2012 Habeas Action Regarding Martin's Mental Health

The items of evidence first presented in the 2012 habeas action are the following:

(1)  A Social Security Administration "disability determination and transmittal" form dated March 4, 1993 that states that Martin was disabled since 1991 with a primary diagnosis of "organic mental disorder" and a secondary diagnosis of "discogenic back disease." Docket # 14, p. 35.

(2)  A portion of a Social Security Administration form that was addressed to Martin, and apparently was used by a doctor to provide information about his disability claim involving mental impairment. Docket # 14, pp. 36-38. The form has various boxes checked. In the "medical disposition(s)" category, the box was checked for "RFC Assessment Necessary (i.e., a severe impairment is present which does not meet or equal a listed impairment)" *id.* at 36.[3] In the section in which to list the categories upon which that medical disposition was listed, there are checks next to the boxes for organic mental disorders; schizophrenic, paranoid and other psychotic disorders; and substance addiction disorders. The reviewer made note of the psychological report

---

[3] On the Social Security Administration's website, an "RFC Assessment" stands for Residual Function Capability Assessment. The RFC is the most a claimant can do despite his or her limitations or restrictions.

1  described in the next paragraph. The reviewer also checked the boxes in the "organic mental
2  disorders" section for "psychological or behavioral abnormalities associated with a dysfunction of
3  the brain . . . as evidenced by" memory impairment, reduced attention and concentration, and being
4  depressed. *Id.* at 37. Many other boxes were left unchecked, however. Within the "organic mental
5  disorders" section, the boxes *not checked* included those for disorientation as to time and place;
6  perceptual or thinking disturbances; change in personality; disturbance in mood; emotional lability
7  and impairment in impulse control. *Id.* No boxes were checked in the "schizophrenic, paranoid and
8  other psychotic disorders" section. *Id.* (It is not clear whether this form was prepared based on a
9  record review, or whether the preparer also examined Martin.)

10              (3)     A single page of a 4-page psychological report dated February 18, 1993 in
11  which a psychologist listed diagnostic impressions of "[o]rganic brain syndrome and schizo-
12  affective disorder;" noted that the patient reported being depressed, having frequent suicidal
13  thoughts, and was hearing voices; and noted that "[t]echnically he would be considered capable of
14  handling funds. Unless there is some relief from his chronic pain he is likely to continue to use
15  alcohol as an aesthetic (sic)." *Id.* at 38.

16              (4)     A CDCR "statewide psychotropic medication consent form" dated December
17  7, 2009 – eleven years after the crime – that listed the side effects of an antipsychotic and an
18  antidepressant Martin apparently was taking. *Id.* at 41.

19              (5)     A computerized print-out indicating that he was prescribed librium while at
20  the hospital a few days before the crime. (The hospital records presented in the 2003 habeas action
21  also showed he was prescribed librium.)

22       Some of the documents Martin attached to his opposition brief were presented in earlier
23  proceedings. The documents at pages 42-46 of Docket # 14 are copies of documents included in the
24  record in the 2003 proceedings, and the documents at pages 48-52 of Docket # 14 are from the state
25  criminal proceedings in 2000.
26  ///
27  ///
28  ///

## III. DISCUSSION

A. The Petition is Successive

The Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA") contains rules limiting the consideration of successive and second habeas petitions. A "successive" petition is a petition that raises grounds identical to those raised and rejected on the merits in a prior petition. *See Kuhlmann v. Wilson*, 477 U.S. 436, 444 n.6 (1986).[4]  A "'ground is successive if the basic thrust or gravamen of the legal claim is the same, regardless of whether the basic claim is supported by new and different legal arguments. . . . Identical grounds may often be proved by different factual allegations.'" *Babbitt v. Woodford*, 177 F.3d 744, 746 (9th Cir. 1999) (quoting *United States v. Allen*, 157 F.3d 661, 664 (9th Cir. 1998)).  A claim presented in a habeas petition that was presented in a prior habeas petition "shall be dismissed." 28 U.S.C. § 2244(b)(1).

In the 2003 habeas petition, Martin alleged that his trial counsel "was ineffective for failing and refusing to develop and pursue a diminished capacity defense and/or other mental defenses to establish that petitioner was suffering from a physical and mental defect prior to and at the time of the alleged offense." Resp. Ex. B at 225 (Docket # 10-5, p. 50).  Martin further alleged in the 2003 habeas petition that counsel was ineffective for "failing and refusing to thoroughly investigate petitioner's history of mental illness and psychiatric care." *Id.*  He contended that a thorough investigation would have revealed two prior suicide attempts in 1994; that he was diagnosed with having major depression; and that he was under psychiatric care and medicated throughout his incarceration at Avenal State Prison in 1994 until his release. *Id.*  Martin further alleged that trial counsel failed to obtain his mental health and psychiatric records. *Id.* at 226.

The same IAC claim was asserted in the 2012 habeas petition.  Martin once again asserted that he received ineffective assistance of counsel in that counsel failed to investigate Martin's mental health history and failed to obtain his medical and mental health records.  *See* Docket # 1, p. 17. The one point that is different in the 2012 habeas petition is that Martin identified the Social

---

[4] In contrast to the "successive" petition, a "second" petition is one that presents new claims after a petition raising other claims has been adjudicated on the merits.  Before the enactment of the AEDPA, the "second" petition was the kind of petition that was the subject of the abuse-of-the-writ doctrine. *See generally Kuhlmann*, 477 U.S. at 444 n.6.

9

Security Administration records as the records that counsel should have obtained. Nonetheless, the evidence in the 2003 habeas action was not substantially different from that presented in the 2012 action. In the earlier action, Petitioner submitted evidence that he was hearing voices and that he suffered psychosis or paranoid-type schizophrenia. In the 2012 petition, the Social Security record similarly lists schizophrenia, paranoid, and other psychotic disorders although that records is ambiguous because in another part of the form, boxes for schizophrenia, paranoid and other psychotic disorders are not checked.

The IAC claim in the 2012 habeas petition is successive, notwithstanding the fact that Martin identified a new source of mental health records that counsel should have pursued. "Although [the petitioner] asserts new factual explanations for his counsel's ineffectiveness at trial, the gravamen of his legal argument is essentially the same." *Babbitt*, 177 F.3d at 746. There may be several sources of mental health records for Martin, and he cannot assert the same claim repeatedly by simply changing the source of the mental health records that were not obtained. The conclusion that the claims are the same is buttressed by the ease with which the district court's analysis of the claim in the 2003 habeas action (*see* page 3, *supra*) covers the claim asserted in the 2012 habeas petition. Because Martin's IAC claim in the 2012 habeas petition is fundamentally the same as that raised and rejected in his 2003 habeas action and adds little, if anything, that is new and different, the claim must be dismissed under § 2244(b)(1), unless Martin can pass through the actual innocence gateway described in the next section.

Martin also asserted a claim in his 2012 habeas petition that he was actually innocent, and therefore his constitutional rights under the Eighth and Fourteenth Amendments were violated. "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993); *see also House v. Bell*, 547 U.S. 518, 555 (2006); *District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 71 (2009) ("Whether such a federal right [to be released upon proof of actual innocence] exists is an open question. We have struggled with it over the years, in some cases assuming, arguendo, that it exists while also noting the difficult questions such a right would pose

1  and the high standard any claimant would have to meet."). Although the court will consider
2  Martin's actual innocence argument in the following section as a possible way to avoid a procedural
3  problem, he could not obtain federal habeas relief on the actual innocence claim alone.

4  B.     Martin Does Not Pass Through the Actual Innocence Gateway

5  A federal court may hear the merits of a successive petition if the failure to hear the claims
6  would constitute a "miscarriage of justice." *See Sawyer v. Whitley*, 505 U.S. 333, 339-40 (1992)
7  (citations omitted). The Supreme Court limits the "miscarriage of justice" exception to habeas
8  petitioners who can show that "a constitutional violation has probably resulted in the conviction of
9  one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (citing *Murray v. Carrier*,
10 477 U.S. 478, 496 (1986)). Under this exception, a petitioner may establish a procedural "gateway"
11 permitting review of defaulted claims if he demonstrates "actual innocence." *Schlup*, 513 U.S. at
12 316 & n.32. "[I]f a petitioner . . . presents evidence of innocence so strong that a court cannot have
13 confidence in the outcome of the trial unless the court is also satisfied that the trial was free of
14 nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and
15 argue the merits of his underlying claims." *Id.* at 316. It is not enough that the evidence show the
16 existence of reasonable doubt, petitioner must show "that it is more likely than not that 'no
17 reasonable juror' would have convicted him." *Id.* at 329.

18 In the context of an affirmative defense on which the defendant has the burden of proof by a
19 preponderance of the evidence, the burden is articulated differently: the petitioner "must prove that
20 it is more likely than not that no reasonable juror would have found that he failed to establish *any* of
21 the . . . . elements of the affirmative defense by a preponderance of the evidence." *Smith v. Baldwin*,
22 510 F.3d 1127, 1140 n.9 (9th Cir. 2007) (en banc), *cert. denied*, 129 S. Ct. 37 (2008). Martin
23 contends he passes through the actual innocence gateway because of his insanity. To prevail on an
24 insanity defense under California law, Martin (1) would have the burden of proof to show insanity,
25 (2) would have to prove insanity by a preponderance of the evidence, and (3) would prevail only

1  with a unanimous verdict.[5]  Under the *Smith* standard, Martin would have to "prove that it is more
2  likely than not that no reasonable juror would have found that he failed to establish" the elements of
3  insanity "by a preponderance of the evidence.  *Smith*, 510 F.3d at 1140.

4  As to the substantive requirements of an insanity defense, a California defendant must show:
5  (1) when he committed the crime, he had a mental disease or defect, and (2) because of that disease
6  or defect, (a) he was incapable of knowing or understanding the nature and quality of his act or (b)
7  was incapable of knowing or understanding that his act was morally or legally wrong.  *See*
8  CALCRIM 3450; *see also* CALJIC 4.00; Cal. Penal Code § 25; *People v. Mills*, 55 Cal. 4th 663, 671
9  (Cal. 2012); *People v. Skinner*, 39 Cal. 3d 765, 775-77 (Cal. 1985); *People v. Horn*, 158 Cal. App.
10 3d 1014, 1031-33 (Cal. Ct. App. 1984).  The insanity defense in California requires more than
11 simply showing mental illness, and showing a mental illness does not equate to proving insanity.
12 *See Mills*, 55 Cal. 4th at 672; *People v. Kelly*, 1 Cal. 4th 495, 535, 540 (Cal. 1992); *People v.*
13 *Kurbegovic*, 138 Cal. App. 3d 731, 749 (Cal. Ct. App. 1982).

14 Martin's evidence simply comes nowhere near to making the requisite showing of insanity.
15 The Social Security Administration records show that he was determined to have a disability based
16 on mental and physical impairments.  For Social Security purposes, the term "disability" means an
17 "inability to engage in any substantial gainful activity by reason of any medically determinable
18 physical or mental impairment which can be expected to result in death or which has lasted or can be
19 expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1).  Being
20 unable to engage in gainful activity is a far cry from being in a mental state in which, due to a
21 mental disease or defect, one is incapable of knowing or understanding the nature and quality of his

---

[5]In California, insanity "is a plea raising an affirmative defense to a criminal charge, although one that does not negative an element of the offense ."  *People v. Hernandez*, 22 Cal. 4th 512, 522 (Cal. 2000).  If a defendant pleads "not guilty" as well as "not guilty by reason of insanity," a first trial is held on the issue of guilt at which he is conclusively presumed sane; if he is found guilty of the crime, a second trial is held on the issue of sanity.  *See* Cal. Penal Code § 1026.  If the defendant pleads only that he is "not guilty by reason of insanity," a single trial is held on the issue of sanity.  *See id.*  The burden of proof is different on the issue of sanity than on the issue of guilt.  In the sanity phase, the defendant has the burden of proof, and must prove insanity by a preponderance of the evidence.  *See* Cal. Evid. Code § 522; Cal. Penal Code § 25(b).  A defendant is only entitled to a verdict of insanity upon a unanimous verdict.  *See People v. Bales*, 38 Cal. App. 3d 354, 356 (Cal. Ct. App. 1974).

act or is incapable of knowing or understanding that his act was morally or legally wrong. *Cf. Todish v. Cigna Corp.*, 206 F.3d 303 (3d Cir. 2000) (being found mentally disabled by Social Security Administration did not make one insane under New Jersey law); *Holtz v. Sheahan*, 199 F. App'x 577 (7th Cir. 2006) (showing that the plaintiff was deemed mentally disabled for purposes of Social Security benefits did not toll the limitations period because the records did not show that the plaintiff was unable to understand or manage his affairs). As noted above, the Social Security records did not indicate Petitioner suffered from disorientation, perceptual or thinking disturbances, or impairment in impulse control.

Martin argues that it is the cumulative effect of the 2012 evidence plus the 2003 evidence that shows his insanity. Not so. The extra documentation would not have tipped the balance in his favor on the insanity question because it was essentially more the same kind of evidence: it was further evidence of the existence of mental illness, but it was weaker because it was staler and second-hand. *See generally Griffin v. Johnson*, 350 F.3d 956, 965 (9th Cir. 2003) (psychiatric evaluation that was years apart from the crime was of minimally probative value in establishing mental state at time of the crime). Martin's evidence from the 2003 habeas action shows: (1) in 1994 (four years before the crime), Martin was hearing voices, suicidal, and depressed, Resp. Ex. B at 434; (2) just a few days before the crime in 1998, a doctor examined Martin and noted that Martin denied any disturbance of cognition, and appeared "grossly normal" for cognition and attention, but appeared to be "depressed, anxious, rather angry and impatient," *id.* at 436[6]: and (3) upon examination by psychologists more than two months after his arrest, Martin was determined to be incompetent to stand trial and was sent to a state mental hospital for treatment for a month, whereupon he was determined to have regained his competency with the aid of psychotropic medications; *id.* at 440. The 2012 evidence and the 2003 evidence show that Martin was mentally ill, but California law is quite clear that "a defendant may suffer from a diagnosable mental illness

---

[6] The doctor's report contains no reported or apparent cognition problems when he examined Martin in the hospital a few days before the crime. This is inconsistent with Martin's current argument that he "checked himself into the hospital . . . partly to get away from the above [landlord/tenant] situation and because his mental illnesses, depression, and hearing voices were beginning to flare up." *See* Docket # 1, p. 20.

without being legally insane under the *M'Naghten* standard" used in California. *Mills*, 55 Cal. 4th at 672.

Moreover, there was evidence in the 2003 trial that undermined any contention that the crime was the product of insanity: Martin was in a landlord/tenant dispute with the victim and eviction proceedings had commenced against him two weeks before the crime; after learning he was to be evicted, Martin threatened the apartment manager; on the day of the attack, Martin made statements that the attack was payback for the landlord's treatment of him; and Martin testified that he acted in self-defense. In the 2003 habeas action, Martin continued to argue self-defense, and in some ways still suggests that he acted in self-defense. *See* Docket # 1, pp. 19-20. Considering the 2012 alone or in combination with the 2003 evidence, Martin has not proven that "it is more likely than not that no reasonable juror would have found that he failed to establish" by a preponderance of the evidence that, as a result of a mental disease or defect, he was incapable of knowing or understanding the nature and quality of his act or was incapable of knowing or understanding that his act was morally or legally wrong. *See Smith*, 510 F.3d at 1140. As he did not make a showing sufficient to pass through the *Schlup* actual innocence gateway, his petition must be dismissed as successive.

C.      <u>If the Petition Is Not Successive, It Is a Second Petition</u>

A claim presented in a second or successive petition under 28 U.S.C. § 2254 that was not presented in a prior petition must be dismissed unless it satisfies the requirements for a newly-presented claim.[7] 28 U.S.C. § 2244(b). A claim "that was not presented in a prior application shall be dismissed unless – " "(I) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B).

---

[7] Section 2244(b)(2)(A) also permits a new claim when it is based on a new rule of constitutional law made retroactive to cases on collateral review by the Supreme Court, but that exception is not relevant to Martin's case.

1    Out of an abundance of caution, the court considers the possibility of Martin's petition being
2 a second rather than a successive petition. If Martin's petition was not successive and therefore
3 could not be dismissed under 28 U.S.C. § 2244(b)(1) for the reasons stated in Section "A" of this
4 order, the petition would have to be dismissed under § 2244(b)(2)(B). First, Martin fails to show
5 that the factual predicate for the claim that counsel was ineffective in not obtaining the Social
6 Security records could not have been discovered previously through the exercise of due diligence.
7 Although he contends in his 2012 habeas action that he assumed his Social Security disability was
8 solely a physical disability and only learned otherwise in 2010, a filing in the 2003 habeas action
9 suggests that he knew back then that the Social Security Administration determination included a
10 mental component. In his "Motion For Expansion of Pages," filed on July 16, 2004, Martin wrote
11 the following as part of his explanation for why his petition was not untimely in 2003: "Petitioner
12 suffered and continues to suffer from a *'mental'* and 'physical disability,' rendering him mobility
13 and *mentally* unable to perform life's major activities since a major surgery in 1991 that has left him
14 *totally disabled by Social Security." See* 2003 habeas action, Docket # 19, at Ex. B (emphasis
15 added). In light of Martin's knowledge in 2003 that his Social Security disability included a mental
16 impairment, he did not act with diligence in waiting until 2010 to obtain records of it to present to a
17 court.[8]

18    Second, the Social Security records and the Social Security mental disability determination
19 do not establish by clear and convincing evidence that, but for constitutional error, no reasonable
20 factfinder would have found Martin guilty or would have failed to find him not guilty by reason of
21 insanity. As mentioned in the preceding section, there was evidence that Martin had been evaluated
22 just days before the crime – albeit for a physical ailment rather than a mental one – and the
23 evaluating doctor made no note of anything remotely resembling insanity or even any serious mental

---

[8] The scope of Martin's knowledge about the Social Security records also presents a problem for his underlying IAC claim. The more he emphasizes that he did not know the Social Security records would contain any evidence of a mental impairment, the less he is able to show that counsel should have known that they would contain such evidence. That is, if Martin had no reason to believe there was any mental health evidence in the Social Security records and thought he was on a physical disability, it is unclear why his attorney should have thought there was mental health evidence to be found in Social Security records – especially if the client told him that his disability was solely a physical one.

illness (other than to note that Martin appeared depressed). As also mentioned in the preceding section, there was evidence that undermined the notion that the attack was the product of insanity; instead it suggests the attack was the product of an ongoing landlord/tenant dispute and personal animosity between Martin and the victim. If the petition is not properly dismissed as a successive petition, it must be dismissed as a second petition that does not satisfy the criteria in § 2244(b)(2)(B).

Having determined that the petition is an impermissible successive petition and, alternatively an impermissible second petition, the court need not reach respondent's arguments that the petition must be dismissed as untimely and procedurally barred.

## IV. CONCLUSION

Respondent's motion to dismiss is **GRANTED**. (Docket # 10). The petition is dismissed because it is successive and the Petitioner does not pass through the actual innocence gateway to have his successive petition considered. In the alternative, the petition is dismissed as an impermissible second petition. The Clerk shall enter judgment and close the file.

IT IS SO ORDERED.

Dated: December 21, 2012

_____
EDWARD M. CHEN
United States District Judge